# AFFIDAVIT OF TASK FORCE OFFICER KEVIN O'NEIL

## Introduction

I, Kevin P. O'Neil, being duly sworn, hereby depose and state as follows:

1. I am a Sergeant with the Massachusetts State Police ("MSP"), and have been so employed since 1992. I have been assigned to the U.S. Drug Enforcement Administration ("DEA") as a Task Force Officer ("TFO") since 2001. I am currently assigned to the Organized Crime Drug Enforcement Task Force ("OCDETF") in Watertown, Massachusetts, a task force comprised of federal, state, and local law enforcement agents from the Department of Homeland Security ("DHS"): Homeland Security Investigations ("HSI"); the Federal Bureau of Investigation ("FBI"); the U.S. Marshals Service ("USMS"); the Massachusetts State Police ("MSP") and officers from several local police departments in Massachusetts. As a DEA Task Force Officer, I have been deputized, and I am an "investigative or law enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516, Title 18, United States Code.

2. My primary duties at the DEA include the investigation of organized narcotics traffickers. I have been involved in approximately thirty investigations involving the organized domestic and international importation and distribution of kilogram quantities of cocaine and heroin. Approximately twelve of those investigations involved the use of court ordered wiretaps. I have been the affiant for federal Title III applications in five of those investigations. Those investigations resulted in the seizure of drugs and drug proceeds, as well as the dismantling of various distribution, transportation, and supply groups based in Colombia, Mexico, and the Dominican Republic and operating in the states of Massachusetts, Arizona, New York, New

Jersey, Connecticut, Rhode Island, Texas, and New Hampshire. I have testified in the grand jury and in court proceedings in Massachusetts District Court and Superior Court, as well as the United States District Court in the Districts of Massachusetts and Maine.

3. I have participated in debriefing dozens of defendants, informants, and witnesses who had personal knowledge regarding major narcotics trafficking organizations, and have participated in all aspects of drug investigations including conducting surveillance, executing searches pursuant to court ordered search warrants, and executing arrests. As a result of my assignments, I have received extensive specialized training in the field of narcotics identification and investigation.

4. Based on my training and experience, I am familiar with the methods of operation employed by narcotics traffickers operating at the local, statewide, national and international levels, including those involving the distribution, storage, and transportation of narcotics and the collection of money that constitutes the proceeds of narcotics-trafficking activities. I am also familiar with the common appearance, packaging, texture and smell of the narcotics listed above.

5. Based on my training and experience, including the training and experience of other law enforcement agents with whom I work, including agents from the Homeland Security Investigation ("HSI"), I am familiar with the routes and methods that criminal organizations based in Montreal, Canada often use to smuggle marijuana, cocaine, and drug proceeds. In particular, I am aware that criminal organizations in Montreal, Canada often import large quantities of high-grade, hydroponic marijuana into the northeast United States including the District of Massachusetts. The sale of this marijuana generates millions of U.S. dollars in cash. The proceeds of these marijuana sales in the northeast, instead of being smuggled back into

Canada, are often transported to the western United States for the purchase of cocaine from drug trafficking organizations in Mexico and Colombia that is then smuggled into Canada.

## The Maritime Drug Law Enforcement Act

6. The Maritime Drug Law Enforcement Act ("MDLEA") makes it unlawful for an individual to "knowingly or intentionally manufacture or distribute, or possess with intent to manufacture or distribute, a controlled substance on board a vessel of the United States or a vessel subject to the jurisdiction of the United States." 46 U.S.C. §70503(a)(1). This prohibition applies even if "the act is committed outside the territorial jurisdiction of the United States." 46 U.S.C. §70503(b). Venue for a violation of this offense is proper in the district which the person first enters the United States. 46 U.S.C. §70504(b)(1).

7. A vessel "subject to the jurisdiction of the United States" includes a vessel without nationality." As a general matter, under international treaties, including the 1982 Law of the Sea Convention, Articles 92 and 94, each State must maintain a register of ships containing the name and particulars of ships flying its flag, and each ship must sail under the flag of only one State. The MDLEA provides that a "vessel without nationality" includes "a vessel onboard which the master or individual in charge makes a claim of registry that is denied by the nation whose registry is claimed." 46 U.S.C. §70502(d)(1)(A). The MDLEA also provides that a vessel is subject to the jurisdiction of the United States when it is registered in a foreign nation "if that nation has consented or waived objection to the enforcement of United States law by the United States." 46 U.S.C. §70502(d)(1)(C).

8. The United States Coast Guard ("USCG") has authority under 14 U.S.C. §89 to make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, in order to enforce federal laws.

3

**This Investigation**

9. I have participated in the investigation of the subjects named in this Affidavit since at least August 2013. I am familiar with the facts and circumstances of the investigation through my personal participation, from discussions with other agents of DEA, HSI, the U.S. Coast Guard and other law enforcement agencies, and from my review of reports relating to the investigation.

10. I am submitting this affidavit in support of a criminal complaint charging: HICHAM RAMZI NAHRA and BENJAMIN CELMA-SEDO with possession of cocaine on board a vessel subject to the jurisdiction of the United States with the intent to distribute in violation of 46 U.S.C. §70503(a)(1) and aiding and abetting such offense, in violation of 18 U.S.C. §2.

11. This affidavit does not set forth all the facts developed during the course of this investigation. Rather, it sets forth only those facts that are necessary and sufficient to establish probable cause to believe that the defendants identified herein have committed the above cited offense. All references to times and locations are approximate and not exact.

**Factual Summary**

12. On August 28, 2013, law enforcement agents and members of the U.S. Coast Guard ("USCG") received an All-Points Bulletin or "BOLO" (Be-On-The-Lookout) Bulletin from the Royal Canadian Mounted Police ("RCMP") for a sailing vessel ("S/V") known as the CALLISTO. The BOLO provided specific information about the CALLISTO including its' dimensions (49.2 feet in length, 14.8 feet in width); unique Hull Identification Number ("HIN") of BEY49280A202; and a last port of call of Puerto la Cruz, Venezuela. On August 29, 2013,

DEA Special ("SA") Mark Tully accompanied the crew of the Coast Guard Cutter ("CGC") DEPENDABLE which was tasked with locating the CALLISTO in international waters.

13. On August 31, 2013, at 5:50 a.m., the crew of the DEPENDABLE first located a vessel matching the description of the CALLISTO in international waters, approximately 400 nautical miles from the eastern coast of the United States. By 8:50 a.m., the DEPENDABLE was approximately 100 nautical miles northwest of the vessel suspected of being the CALLISTO. During the early morning hours of September 1, 2013, the DEPENDABLE initiated intercept operations of CALLISTO. At 3:25 a.m., the DEPENDABLE was approximately 10 nautical miles from the CALLISTO and launched two boats (referred to herein as "A1" and "A2") which ultimately established visual contact with the CALLISTO. Beginning at 5:07 a.m., USCG Lieutenant Jordan Boghosian made several attempts to make contact with the CALLISTO over radio Channel 16 with negative results.

14. At 5:15 a.m., DEPENDABLE's launched vessel A1, occupied by Maritime Law Enforcement Specialist-First Class ("ME1") Gregory Petrongolo. ME1 Petrongolo illuminated the deck of the CALLISTO with a spotlight which revealed a male on the deck. USCG Lieutenant Boghosian again attempted to make contact with the CALLISTO with negative results. At 5:20 a.m., A1 approached the CALLISTO. At that time, the deck of the vessel was unoccupied. ME1 Petrongolo reported that the vessel was flying a Canadian Flag and displayed the name, "ELEGANCE." (As further described below, this vessel was later determined to be the CALLISTO, and while it displayed a Canadian flag, it is not currently registered as a Canadian vessel and as such is a vessel without nationality under the MDLEA). At 5:22 a.m., A1 made radio contact with the CALLISTO and requested that the crew of the CALLISTO come outside on deck. At that time, ME1 Petrongolo observed two males on board. The USCG identified the

two men as HICHAM RAMZI NAHRA, a citizen of Canada, and BENJAMIN CELMA-SEDO, a citizen of Spain, through their respective passports.

15. While A1 was stationary alongside the CALLISTO, USCG personnel questioned NAHRA who stated that the purpose of their trip was to deliver the vessel to Montreal, Canada. NAHRA said the owner of the vessel was Mr. Anderson, but could not provide any contact information for Mr. Anderson, or the location to where the vessel was to be delivered. (Anderson is believed to be Paul Henderson of Burtonsville, MD, the prior owner of the CALLISTO). NAHRA provided Canadian vessel registration documents for S/V ELEGANCE, but which bore the same Hull Registration Number ("HIN") for the CALLISTO, BEY4928A202, and registration number 820101. NAHRA then stated that the boat was being delivered to "Richard Nixon."

16. Around this time, Machinery Technician-Second Class ("MK2") Cedestinson Ductan engaged CELMA-SEDO in conversation. At this time, NAHRA began acting erratically and spoke to CELMA-SEDO in French. MK2 Ductan is fluent in French, and overheard NAHRA telling CELMA-SEDO what to say to MK2 Ductan. CELMA-SEDO first told MK2 Ductan that he (CELMA-SEDO) was the Master of the vessel, though NAHRA at times also claimed to be the Captain. When MK2 Ductan asked CELMA-SEDO to whom he was delivering the vessel, NAHRA stopped CELMA-SEDO from answering. Both NAHRA and CELMA-SEDO stated they had picked the vessel up in St. Vincent. (Both NAHRA and CELMA-SEDO's passports indicated a last entry of Vicente, Grenadines on July 29, 2013). NAHRA also volunteered that he had a previous conviction in Canada for trafficking marijuana.

17. Regarding the ownership of the vessel, NAHRA produced a copy of a Canadian Passport for "Gary Nixon" and a Bill of Sale for the S/V CALLISTO, dated July 23, 2012, from

6

Paul R. Henderson, 3025 Green Castle Rd, Burtonsville, MD 20869, to Gary Nixon, 335A 17 East Ave, Deux Montagnes, for $142,500. NAHRA said he had paid his own way to fly from Canada to St. Vincent to pick up the boat and was being paid $1,000 to deliver the boat to Nixon in Montreal. NAHRA stated he was only in St. Vincent one week prior to departing on the CALLISTO. CELMA-SEDO stated that he was at the boat for two weeks before NAHRA arrived. NAHRA said he had no idea when they were due to arrive in Canada.

18. Following the initial contact with CALLISTO, Commander Paul Greg ordered A1 and A2 to maintain surveillance of the CALLISTO while information about the CALLISTO was forwarded to Canadian law enforcement authorities in order to seek permission from the government of Canada to board the CALLISTO. At around 1:00 p.m., while awaiting confirmation from Canadian law enforcement authorities, USCG personnel observed NAHRA attempt to make a phone call from a SAT phone. As A1 closed the distance to the S/V CALLISTO, NAHRA put the SAT phone down and returned below the deck.

19. A check of Hull Identification Number ("HIN") through RCMP Marine Security Operations Centre-East confirmed that Canada did not have a vessel registered with that HIN. Furthermore, the actual registration number for the CALLISTO that NAHRA provided to USCG personnel, 820101, also returned no active vessels registered in Canada.

20. On September 2, 2013, at 1:20 p.m., USCG Cutter Dependable received the authorization to conduct a stop, board and search of the CALLISTO. At 3:41 p.m., a boarding team of seven USCG personnel boarded the CALLISTO and began conducting an initial security sweep. At 4:00 p.m., Boatswain's Mate-First Class ("BM1") Peter Fager, while in the process of inspecting the forward bilge, encountered approximately 23 large, heavy plastic mesh bags each containing approximately 25-27 kilogram brick shaped packages which needed to be moved to

access the forward bilge area. These large, heavy mesh bags were in open view of the forward compartment area. After inspecting the forward bilge area, BM1 Fager and ME1 Petrongolo examined the contents of the heavy plastic mesh bags. Both BM1 Fager and ME1 Protrongolo recognized the packages to contain contraband and appeared to be kilograms of cocaine. The contents of one of the kilogram bricks was then tested utilizing the USCG narcotics identification kit. The substance contained in the brick shaped object tested positive for cocaine. This test was conducted twice, both times positive.

21. Inside the interior hull of the vessel, USCG personnel found and located a total of about 23 different mesh bags/bales that contained a total of approximately 631 kilograms of cocaine. At an approximate wholesale value of $33,000 per kilogram of cocaine, the total street value of the cocaine is more than $20 million.

22. Further investigation by the USCG, in consultation with Canadian law enforcement authorities, confirmed that while the CALLISTO had in fact been sold in July 2012 and displayed a Canadian flag, the CALLISTO was never registered as a Canadian vessel and as such is a vessel without nationality subject to the jurisdiction of the United States under the MDLEA.

## Conclusion

23. Based on information contained in this affidavit, I submit that there is probable cause to believe that: (1) HICHAM RAMZI NAHRA and (2) BENJAMIN CELMA-SEDO have committed the crime of possession of cocaine on board a vessel subject to the jurisdiction of the United States with the intent to distribute in violation of 46 U.S.C. §70503(a)(1) and aiding and abetting such offense, in violation of 18 U.S.C. §2.

Kevin P. O'Neil
Task Force Officer
U.S. Drug Enforcement Administration

Sworn to before me this ____ day of September, 2013

HON. LEO T. SOROKIN
Chief United States Magistrate Judge
District of Massachusetts